IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

THADDEUS A. MENSAH,

      Plaintiff,

vs.

STEVEN MNUCHIN, SECRETARY,
UNITED STATES DEPARTMENT OF
TREASURY,

      Defendant.

_____/

## COMPLAINT FOR DAMAGES

Plaintiff, THADDEUS A. MENSAH, sues Defendant, STEVEN MNUCHIN, SECRETARY, UNITED STATES DEPARTMENT OF TREASURY, and shows:

### Introduction

1.      This is an action by THADDEUS A. MENSAH against his former employer, the Internal Revenue Service, for discrimination based on his disabilities, race and national origin and reprisal for seeking reasonable accommodations for his disabilities. By the filing of this action, Plaintiff seeks compensatory damages, equitable relief, and an award of costs and attorneys' fees.

### Jurisdiction

2.      This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16, *et seq*. ("Title VII") which applies to employees of the federal government and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*. (Rehabilitation Act). The Court has federal question jurisdiction over Plaintiff's Title VII claims pursuant to 42 U.S.C. § 2000e-16 and jurisdiction over both the Title VII claims and the Rehabilitation Act claims under 28 U.S.C. § 1331.

1

## Venue

3.      This action properly lies in the Miami Dade Division of the United States District Court for the Southern District of Florida, because the unlawful employment practices were committed in Miami-Dade County and all employment records relevant to such unlawful employment practices are maintained and administered within this judicial district.

## Parties

4.      Plaintiff, THADDEUS A. MENSAH (hereafter "Plaintiff" or "MENSAH"), at all times material, was a Tax Compliance Officer employed by the Internal Revenue Service, which is part of the UNITED STATES DEPARTMENT OF TREASURY.

5.      Plaintiff currently resides in New Jersey and is a black American citizen whose country of origin is Ghana, Africa.  He is therefore protected from discrimination under Title VII based on his race and national origin.    MENSAH is also protected by 42 U.S.C. § 2000e-3(a) which prohibits discrimination against employees who oppose unlawful employment practices under Title VII, or who file administrative charges of discrimination under Title VII.

6.      At all times material, Plaintiff was "handicapped" under the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*., in that he suffers from physical impairments, i.e., glaucoma, diabetes, anxiety disorder, major depression and attention deficit disorder (ADD), that, either alone or in combination, substantially limit one or more major life activities, he had a record of such impairments and/or was regarded as having such impairments.  Plaintiff was also a "qualified individual" under the Rehabilitation Act, in that he could perform the essential functions of his job as a Tax Compliance Officer with or without reasonable accommodations, and in fact performed those functions at a fully successful level or better.

7.      Defendant, STEVEN C. MNUCHIN, is the current SECRETARY OF THE UNITED STATES DEPARTMENT OF TREASURY (hereafter "Defendant," "Agency" or

2

"TREASURY"), which includes the Internal Revenue Service ("IRS") where Plaintiff worked and is named as Plaintiff's employer in accordance with 42 U.S.C. § 2000e-16(c). TREASURY is also an Executive Agency of the United States under the Rehabilitation Act, 29 U.S.C. § 701, *et seq*.

## Exhaustion of Administrative Remedies

8.      On or about January 31, 2018, MENSAH timely filed a Formal EEO Complaint of Discrimination with Defendant's EEO Office, raising claims for race discrimination, national original discrimination, disability discrimination and reprisal, which was assigned TD Case No. IRS-18-0109-F (hereafter "EEO Complaint").

9.      After the IRS completed the processing of the EEO Complaint and issued a Report of Investigation, MENSAH timely filed a request for a hearing on August 13, 2018 and the EEO Complaint was assigned EEOC Case No. 510-2018-00438X and designated for hearing before an administrative judge in  the EEOC Miami District Office.

10.      On June 19, 2020, Plaintiff withdrew his EEO Complaint and hearing request from the EEOC pursuant to 29 C.F.R. § 1614.407(a)-(b) because more than 180 days had elapsed since the hearing request with no final action by the EEOC.   Pursuant to Plaintiff's request, an Order of Dismissal was entered by the EEOC on June 19, 2020.

11.      This civil action is being filed within thirty days of withdrawing the EEO Complaint from the EEOC and the entry of the EEOC Order of Dismissal on June 19, 2020.  MENSAH has therefore complied with all administrative prerequisites to pursue his claims in the United States District Court for the Southern District of Florida.

12.      MENSAH has retained the undersigned attorney to represent him in this case and is obligated to pay reasonable costs and fees for his attorney's services in the event he is the prevailing party in this matter.

### General Factual Allegations

13.     Plaintiff was hired by the Agency in 2008 in California as a disabled individual under the Agency's Workforce Recruitment Program for Students with Disabilities. He was employed by the IRS for nearly ten years in California (2008 to 2013) and Florida (2013 to 2017), with his last day of work on December 22, 2017.

14.     MENSAH is an American citizen whose country of origin is Ghana, Africa.

15.     Plaintiff initially worked for Defendant in California until 2013, when MENSAH transferred to a position in the Fort Myers, Florida office as a Tax Compliance Officer (GS-0526-09), working under the supervision of Group Leader Connelia Finn. Even with his disabilities, MENSAH was able to meet the caseload and performance standards for his position without any need for reasonable accommodations while assigned to the Fort Myers Office under the supervision of Connelia Finn.

16.     In or about November 2014, MENSAH applied for and was granted a hardship transfer to the Miami Tax Compliance Office in Miami, Florida, where he was assigned to Group 5 under the supervision of Patricia Benedetti. At the time of the transfer, MENSAH had completed his probationary period and training in Fort Myers and was rated as "fully successful" on his annual performance appraisal.

17.     Once he transferred to Miami, the consistently higher caseload and lack of managerial support in Miami began to exacerbate Plaintiff's disabilities and made it increasingly difficult to meet the performance expectations of Patricia Benedetti. Plaintiff's average weekly caseload in Miami regularly exceeded 100 cases, which was significantly more than in Fort Myers and approximately 30% higher than the Agency guidelines which dictated an average caseload of 65-70 for GS-9 and GS-11 Tax Compliance Officers.

4

18.     During the period from November 2015 through June 2016, Ms. Benedetti was detailed to other duties by the Agency and although she physically remained in Miami during her temporary assignment, Connelia Finn was appointed as the Acting Manager of the Miami TCO. Ms. Finn was still domiciled in Fort Myers but she made frequent trips to Miami to meet in person with MENSAH and the employees in Group 5.

19.     When MENSAH's disabilities began to affect his performance in Miami beginning in early 2016, he initially tried to speak with Ms. Benedetti about his issues, but instead of showing any empathy or referring him to the Agency's Reasonable Accommodations Coordinator or EEO Office, Ms. Benedetti instead mocked Plaintiff for seeking assistance and accused him of trying to use his disabilities as an excuse for not doing his job.

20.     Because he had a good working relationship with Connelia Finn, Plaintiff also discussed with her the difficulties he was having with his caseload under Ms. Benedetti and asked for suggestions and guidance about how to stay organized while meeting the increased caseload. In April 2016, Ms. Finn advised Plaintiff to consider seeking assistance through the Agency EAP program and she continued to work with him to improve his performance until her assignment as Acting Group Manager ended in September 2016.

21.     Despite the significantly higher workload in Miami, MENSA received a fully successful rating  of 3.0 from Connelia Finn on his annual evaluation in June 2016, which was reviewed and approved by Patricia Benedetti and her supervisor, Territory Manager Debbie McMillan.

22.     Prior to returning to Fort Myers, Ms. Finn also completed a "departure evaluation" of Plaintiff for the period of June 1, 2016 to September 17, 2016,  in which she again rated him "fully successful" with an average CJE score of 3.0.

23.     After Ms. Benedetti resumed her day-to-day duties as Group Manager in September 2016, she once again increased Plaintiff's caseload and renewed her harsh and unwarranted criticism of his job performance whenever he tried to seek guidance or assistance.

24.     In late September 2016, MENSAH spoke with his union representative, Pucho Perez, who agreed that the workload that Ms. Benedetti assigned to Plaintiff and the other employees under her supervision exceeded the Agency's guidelines and was unreasonable.

25.     On September 27, 2016, Plaintiff sent the following email to Patricia Benedetti and her supervisor, Territory Manager Debbie McMillan:

> I would like to discuss a very personal and Important matter with you. I have a serious health issue and would like to schedule a conference call meeting and discuss it with you. I believe it is important to let you know what is going on with me so that you may able to help me with my work from now on. Please let me know what day is available this week for to discuss this Issue.
>
> Thank you so much for your patience with me being here.
>
> Sincerely Yours,
>
> Thaddeus Mensah
> TCO, Miami POD

26.     After Plaintiff sent his email, a brief conference call was scheduled, during which MENSAH advised Patricia Benedetti and Debbie McMillan of his disabilities and asked them to consider some type of adjustment or reduction of his extremely high workload and/or new case assignments so that his caseload would not exceed the Agency's own guidelines for his position.

27.     On October 3, 2017, Patricia Benedetti emailed MENSAH and advised him that since he had requested reasonable accommodations for his disabilities, he needed to complete and submit a formal written request.in accordance with Agency policies and procedures.

28.     In accordance with Patricia Benedetti's instructions, Plaintiff submitted a Treasury Form 13661 Reasonable Accommodations Request on October 27, 2016, for multiple impairments, including glaucoma, ADD and diabetes.   As a reasonable accommodation, MENSAH requested a 20% to 30% reduction of this then-average caseload of more than 100 cases, so that his workload would be consistent with his job description and Agency guidelines that dictated an average caseload of 65 to 70 cases.

29.     At the time he submitted the Form 13661, MENSAH was unaware that Patricia Benedetti and Debbie McMillan had already made a final decision in early October 2016 to deny his request for any type of caseload adjustment or reductions as an accommodation for his ADD, depression and anxiety disorder.

30.     The decision to deny the request for accommodations was made unilaterally by Ms. Benedetti and Ms. McMillan and in clear violation of Defendant's own EEO policies and procedures.   Ms. Benedetti conducted her own "legal research" and there was no meaningful interactive process with Plaintiff to discuss the request and the accommodations were summarily rejected by local management long prior to any involvement by Brenda Kampe, the subject matter expert assigned to the case by the Agency Reasonable Coordinator in mid-December 2016.

31.     In addition to the lack of any interactive process as required by the Rehabilitation Act, although Ms. Benedetti later claimed that Plaintiff's excessive caseload was an essential function of his position that could not be modified, the Agency never conducted any formal review of the essential functions to determine the appropriate caseload for the position (or whether Plaintiff's caseload was appropriate) and there was no discussion or analysis as to whether the requested accommodations would have created any undue hardship.   Instead, Ms. Benedetti – who had no subject matter expertise or formal training regarding the Agency's EEO policies -- was permitted to arbitrarily determine at the outset of the process that MENSAH's average caseload of

over 100 cases was due to his own alleged shortcomings and her false narrative was taken at face value by Debbie McMillan, who was based in Jacksonville, Florida and rarely spent any time in the Miami Office.

32.     In addition to improperly denying the reasonable accommodation request at the local level, with no subject matter expertise and without any formal notice to Plaintiff, Patricia Benedetti reacted in an openly negative and hostile manner to Plaintiff's formal requests for accommodations and his subsequent attempts to discuss the issues as part of the interactive process.  By her actions and words, it appeared that Ms. Benedetti was annoyed by MENSAH's accommodation requests and viewed them as an excuse to avoid doing his job and an attempt to undermine her managerial right and authority to assign his workload, and she therefore began to retaliate against MENSAH for continuing to seek accommodations for his ADD, depression and anxiety disorder.   The retaliation continued for nearly a year until Ms. Benedetti left the Miami Office for another position in or about July 2017, and included heightened and unwarranted criticism of Plaintiff's work-product and job performance and inappropriate mocking and verbal abuse of MENSAH during group meetings and when he attempted to initiate private discussions with her about his disabilities, how they affected his ability to perform his job duties and the status of his accommodations requests.

33.     Upon information and belief, Ms. Benedetti also violated Agency policies when she shared confidential information about Plaintiff's disabilities and his accommodation requests with the Miami Group Clerk, Domingo Antonio Jimenez.   Plaintiff had enjoyed a good working relationship with Mr. Jimenez during his first year in Miami but after MENSAH made his initial request for workload accommodations in late September 2016, Mr. Jimenez' attitude and treatment of Plaintiff changed, and he began to openly mock Plaintiff in group meetings and single him for unfair criticism that was not directed to other employees.

8

34.     Despite the fact that he did not hold any managerial or supervisory position, Domingo Antonio Jimenez berated MENSAH in front of his co-workers and Patricia Benedetti, complaining that Plaintiff did not know how to do his job and that Plaintiff's mistakes were making his own job harder.   He also refused to provide with the same level of administrative support that he readily gave to Plaintiff's co-workers and mocked Plaintiff's national origin by making offensive jokes and negative references about the fact that Plaintiff was born in Ghana, Africa before he became a United States Citizen.

35.     At least one of Plaintiff's co-workers (Heidi Rodriguez) spoke to Mr. Jimenez to advise him that it was inappropriate to mock MENSAH and discuss his job performance in meetings, but to Plaintiff's knowledge, no remedial action was ever take by Ms. Benedetti or Debbie McMillan to stop the verbal abuse from Mr. Jimenez or his constant mocking and criticism of MENSAH.

36.     At the same time Patricia Benedetti was increasing her scrutiny and criticism of MENSAH's job performance during the last three months of 2016, she was also undermining and frustrating his ability to complete his existing workload in a timely manner.   For example, she changed Plaintiff's work schedule from five eight hour days per week (which he had started working at the suggestion of Connelia Finn) and required him to work a "compressed schedule" of four ten hour days, despite the fact that the longer days were more fatiguing and therefore increased the difficulties he had with focus, concentration and workload management.

37.     Although Patricia Benedetti was known to have a very blunt direct and sometimes rude management style, MENSAH's co-workers agreed that she singled Plaintiff out for harsh criticism more often than anyone else in the group, despite the fact that he treated her and others with the utmost respect and always spoke in a calm, polite and professional manner.

9

38.     MENSAH's ability to communicate with Patricia Benedetti about his workload issues and accommodation requests was further eroded by Ms. Benedetti's frequent recurring details to other management duties between October 2016 and July 2017.  During this time frame, Ms. Benedetti was replaced by a rotation of Acting Group Managers who were drawn from Plaintiff's co-workers in Group 5, and who had no authority or responsibility under the Agency's policies to make decisions on accommodation requests or communicate such decisions while in an acting status.

39.     On the rare occasions when she was not detailed to other duties, Ms. Benedetti also denied (or simply ignored) Plaintiff's requests for periodic "workload reviews" or any additional training that would assist him in managing his caseload and spoke down to him in an extremely harsh and unprofessional manner when he tried to seek her assistance or guidance.   Instead of assisting Plaintiff in the same responsive manner as she did with his co-workers who requested guidance, Patricia Benedetti began to intensify her documentation of his errors and mistakes and on several occasions she even privately accused MENSAH of using his disabilities as an excuse for the fact that he was stupid and lazy.

40.     When nearly two months passed without any interactive process or response to his formal request for accommodations, Plaintiff submitted a second Form 13661 Reasonable Accommodations Request on December 23, 2016, for anxiety disorder and attention deficit disorder.  This form was completed by a licensed clinical social worker who had treated Plaintiff and requested "workload adjustment to achieve manageable stress levels."

41.     On January 20, 2017, after several more weeks passed with no response to his accommodation requests, MENSAH submitted his second Form 13661 Reasonable Accommodations Request for glaucoma and on January 22, 2017, a third Form 13661 was submitted for Plaintiff's ADD and anxiety disorder.

10

42.     In late January or early February 2017, MENSAH was formally notified that his accommodation requests for glaucoma and diabetes had been granted, and that he would be receiving an ergonomic chair and keyboard along, noise-cancelling headphones and an assistive device to increase the size of the font on his computer screen.   However, despite his frequent inquiries, there was still no formal response to his three separate requests for accommodations for his ADD, depression and anxiety disorder, and no interactive process had occurred.

43.     Instead of responding to Plaintiff's numerous inquiries about his request for accommodations for ADD, depression and anxiety disorder or initiating the interactive process required by the Agency's policies, on the increasingly rare occasions that she was in the office, Ms. Benedetti continued to criticize and document his job performance.   During this period, MENSAH once again had few opportunities to even communicate with Ms. Benedetti about his accommodation requests or his workload issues, and the acting managers during her details (Plaintiff's co-workers Heidi Rodriguez and Ana Perdomo) were not involved in the decision making process on the accommodations issues and had no authority to speak about it.

44.     Plaintiff was supposed to receive his annual performance appraisal from Patricia Benedetti in June 2017.  In light of Ms. Benedetti's harsh criticism over the prior months, her frequent details to other duties and the Agency's failure to engage in the interactive process or respond to his requests for accommodations for over six months, Plaintiff was highly concerned that the review process would not be conducted fairly by Ms. Benedetti and instead would be used against him.

45.     While MENSAH was trying to schedule his annual evaluation meeting in June 2017, he was unaware of two significant events that occurred on his requests for accommodations that had now been pending for over six months.

46.    On June 22, 2017, the assigned Reasonable Accommodation Coordinator Brenda Kampe received a report from Papiya Ray, M.D., Occupational Medicine Consultant, who was engaged by the Agency to conduct an independent review of Plaintiff's request for an adjustment of his workload.  Although Dr. Ray was not asked to render a decision on whether a "30% caseload reduction" should be granted by the Agency under its EEO policies, based on her review of Plaintiff's job description and the information from Plaintiff's mental health care providers, she concluded that "a reduction in caseload would reduce one of those stressors, thereby improving his symptoms and relieving some of his limitations."

47.    On June 26, 2017, Brenda Kampe forwarded Dr. Ray's letter to Plaintiff, Patricia Benedetti and Debbie McMillan with a request for management to consider the 30% caseload reduction.   There is no indication that Ms. Benedetti or Ms. McMillan ever followed Brenda Kampe's recommendation to consider the caseload reduction in light of Dr. Ray's opinion, and there was no interactive process or discussion with MENSAH regarding Dr. Ray's findings.

48.    One day later, on June 27, 2017 – over eight months following Plaintiff's submission of the first Treasury Form 13661 in October 2016 -- Debbie McMillan finally completed Part IV of  Form 13661 and denied MENSAH's request for what was described as a "reduction of workload."  In Section 2 of Part IV (Reasons for Denial), Ms. McMillan chose the following options:   "Accommodation Ineffective/Inappropriate," "Accommodation Would Require Removal of Essential Function" and "Accommodation Would Require Lowering of Performance or Production Standard."  She did not check the box for "Accommodation Would Cause Undue Hardship."

49.    In Section 4 of Part IV, Debbie McMillan wrote the following narrative of the reasons for the decision:

An employee with a disability must meet the same production standards, whether quantitative or qualitative, as a non-disabled employee in the same job. Lowering or changing a production standard because an employee cannot meet it due to a disability is not considered a reasonable accommodation.

However, a reasonable accommodation may be required to assist an employee in meeting a specific production standard. In this case, the employee has been provided with ergonomic chair and IRAP Equipment, including large monitor, large keyboard, noise canceling headphones and Zoom technology in order to assist him in meeting the performance and production standards of the position. He also has been provided with a mentor/coach for technical and procedural support.

50.     In addition to providing the employee with a statement of the reasons for the decision on an accommodations request, Sections 4 and 5 of Part IV give critical notice of the employee's rights to seek reconsideration of the denial (within 15 days of receipt) and the right to challenge the decision through the Agency's EEO process (within 45 days of receipt).

51.     Defendant's policies require an employee to be provided with the formal denial of an accommodations request, but MENSAH never received a copy of Part IV of the Form 13661 that was purportedly completed by Debbie McMillan on June 27, 2017.   As a result, the Agency deprived MENSAH of any notice of his right to seek reconsideration or avail himself of the EEO process, which he certainly would have exercised in light of his concerns about the unreasonable delays in responding to his requests and the unfair treatment he had received from Patricia Benedetti after he submitted his requests.

52.     Although Plaintiff made his initial request to schedule his annual evaluation meeting in early June 2017,  Patricia Benedetti was too busy to meet with him until almost two months later, on July 23, 2017.  When they finally met to review and discuss his evaluation, Ms. Benedetti was in the process of transferring to a new position in the Agency's office in Plantation, Broward County, Florida, after which she would no longer be MENSAH's supervisor.   She seemed distracted and irritated during the brief meeting, and spoke to Plaintiff in an extremely

13

rude and  unprofessional manner concerning his job performance during the preceding year, even though she had spent most of the year detailed to other duties while MENSAH reported to a series of Acting Managers.

53.     Because he received a score only 1.8 on his evaluation, Agency policies dictated that Plaintiff was to be placed on a formal Performance Improvement Plan (PIP) and that if is performance did not improve or if he failed to find another position within the Agency he could be involuntarily separated from his employment.

54.     MENSAH filed a written appeal of his evaluation with Defendant's Human Resources Department on July 30, 2017.  The seven-page document listed and discussed in detail several concerns, including "lack of fairness in the evaluation process" and "Discrimination because of my disability" and noted that Plaintiff he had made several requests for accommodations prior to receiving the evaluation.

55.     Patricia Benedetti was never provided with a copy of the appeal by Human Resources and MENSAH never received any response from Human Resources to either the appeal or his complaint of disability discrimination during the evaluation cycle, nor was he provided with any notice regarding his EEO rights.

56.     Patricia Benedetti formally left the Miami Office by the end of July 2017 and was once again replaced by a rotation of Acting Group Managers who had no authority to consider or make decisions on accommodation requests and no desire to assist MENSAH with his caseload issues.

57.     After Patricia Benedetti gave MENSAH a score of 1.8 on his evaluation, Brenda Kampe was directed by her supervisor to assist Plaintiff in his own efforts to self-locate an alternative position within the Agency that he could perform.  If he was not successful in finding another position on his own, he was to be placed on a PIP.

14

58.     Despite Ms. Kampe's efforts, no suitable positions were found between August and the end of December 2017, and Plaintiff was never offered another job within the Agency.

59.     During the several months that Ms. Kampe worked with Plaintiff to help him self-locate another position, she still never advised him that local management had formally denied his requests for accommodations and never provided him with a copy of Part IV of the Form 13661 that was purportedly completed by Debbie McMillan on June 27, 2017.

60.     Due to Hurricane Irma, the Miami Tax Office was closed for several weeks in September and early October 2017.  During this period employees worked from home and an online WhatsApp chat group was set up so that the employees could continue to communicate about work-related issues if necessary.   The employees in Plaintiff's group were aware that he was visiting family in Ghana from September 18, 2017 to October 23, 2017 due to a death in his family.

61.     Prior to MENSAH's return from Ghana, on or about October 20, 2017, Group Clerk, Domingo Antonio Jimenez posted an extremely offensive picture on the employee chat group, which depicted an individual dressed in what appeared to a ceremonial African tribal costume with feathers, spear and shield, under which Mr. Jimenez had typed the words "TCO Returns Home."

62.     Plaintiff became aware of the offensive WhatsApp posting by Mr. Jimenez upon returning to the office from his trip to Ghana and was extremely distressed by the incident and the ongoing harassment from Mr. Jimenez.  He reported the incident to the Acting Group Manager, Xavier Berros Rosero, who advised him of his option to seek EEO counseling regarding the harassment from Mr. Jimenez.

63.     Because he was already working with her on a potential reassignment, MENSAH initially contacted Brenda Kampe about his discrimination complaint against Domingo Antonio Jimenez, who in turn advised him to contact Defendant's EEO Office.

64.     When he contacted the Agency EEO Office on November 14, 2017 to seek counseling, Plaintiff had still not been advised by the Agency of the formal denial of his accommodation request and, in violation of Agency policies, had still never been provided with Part D of the Form 13661 Request for Accommodations that was purportedly completed by Debbie McMillan on June 27, 2017.  He therefore raised issues regarding the denial of reasonable accommodations, disparate treatment and hostile work environment based on his disabilities, race and national origin discrimination.

65.     By mid-November, MENSAH was suffering from acute anxiety and depression as a result of his workplace issues, which led his treating mental health-care provider, Dr. Stanley Seidman, to prepare a 24-page page report on November 10, 2017 detailing his diagnosis and treatment of Plaintiff and the basis for his support of Plaintiff's request for an adjustment of his caseload as a reasonable accommodation.

66.     MENSAH submitted a copy of Dr. Seidman's report to Agency management and during the EEO counselling process, he made a final request for a reduction of his still-excessive caseload as a reasonable accommodation for his disabilities, which was again denied by Debbie McMillan in early December 2017.

67.     Despite several requests during the EEO counselling process, Plaintiff was also never advised whether any disciplinary or other remedial action was taken against Antonio Domingo Jimenez for the offensive WhatsApp posting.

68.     In early December 2017, MENSAH reported another incident to management and the EEO counselor after Mr. Jimenez refused to provide Plaintiff with ink cartridges for his printer

even while he was handing out ink cartridges to his co-workers, and then aggressively yelled at MENSAH to go get them himself from the supply room if he needed them.

69.     On December 22, 2017, Dr. Seidman wrote a note to the "Concerned IRS" which stated as follows:  "Thaddeus is under my care for a severe stress disorder.  As of December 22, 2017, due to the severity of his mental status, I am recommending that he cease performing case work with the IRS and that he apply for disability immediately."

70.     Following his removal from work by Dr. Seidman, Plaintiff applied for disability retirement with the Office of Personnel Management on February 2, 2018.

71.     By decision dated August 18, 2018, OPM determined that Plaintiff eligible for disability retirement because he was "disabled for your position as a Tax Compliance Officer due to generalized anxiety disorder and major depressive disorder."

72.     There are no legitimate reasons for Defendant's denial of Plaintiff's requests for reasonable accommodations, the reprisal he endured from Patricia Benedetti following his requests for accommodations or the discrimination to which he was subjected based on race and national origin.

73.     As a result of Defendant's denial of reasonable accommodations from October 2016 to December 2017 and the discrimination and hostile work environment created by Patricia Benedetti and Antonio Domingo Jimenez, MENSAH's working conditions were so intolerable that a reasonable person in Plaintiff's position would be compelled to resign.

## COUNT I

### Disability Discrimination

74.     Plaintiff re-alleges paragraphs 1 through 73 as if fully set forth herein.

75.     The conduct of Defendant more particularly alleged above constitutes a violation of the Rehabilitation Act, 29 U.S.C. § 794(a), which prohibits the denial of any benefit of

employment, or discrimination by any Executive Agency of the United States, because of a federal employee's disability.

76.     After Plaintiff requested reasonable accommodations for his disabilities, Defendant violated the Rehabilitation Act by: (a) failing to engage in the interactive process with Plaintiff; (b) failing to timely respond to the accommodation requests for over eight months; (c) improperly denying the requests for accommodations and (d) failing to advise Plaintiff of his EEO rights to seek reconsideration of the denial or to challenge the denial under the Rehabilitation Act. based

77.     Defendant's unlawful conduct in violation of the Rehabilitation Act caused Plaintiff to suffer compensatory damages, including, but not limited to, emotional pain and suffering, mental anguish and other intangible injuries, and ultimately resulted in Plaintiff's constructive discharge from employment at the end of December 2017.

WHEREFORE, Plaintiff, THADDEUS MENSAH, prays that this Court will:

(a)     Declare Defendant's conduct to be in violation of the Rehabilitation Act;

(b)     Enjoin Defendant from further engaging in such conduct;

(c)     Award Plaintiff compensatory damages;

(d)     Award Plaintiff his costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988, and;

(e)     Grant such other and further relief as may be deemed just and proper.

## COUNT II

### Retaliation for Seeking Reasonable Accommodations

78.     Plaintiff re-alleges paragraphs 1 through 73 as if fully set forth herein.

79.     The conduct of Defendant more particularly alleged above constitutes a violation of the anti-retaliation provisions of the Rehabilitation Act, 29 29 U.S.C. § 794(a), which

incorporates § 12203(a) of the Americans With Disabilities Act and provides "no person shall discriminate against an individual because such individual has opposed any act or practice made unlawful by this Act."

80.     Defendant violated the anti-retaliation provisions of the Rehabilitation Act when, following Plaintiff's initial request for reasonable accommodations in September 2016, his supervisor Patricia Benedetti subjected MENSAH to adverse treatment that included, but was not limited to: unwarranted scrutiny and criticism of his job performance; inequitable distribution of workload; downgrading his annual performance rating to a rating of 1.8 so that he would be terminated for poor performance if he did not find an alternative position and verbal harassment.

81.     The adverse treatment and verbal harassment of MENSAH following his requests for reasonable accommodations created a hostile work environment that was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

82.      Defendant's unlawful conduct in violation of the Rehabilitation Act caused Plaintiff to suffer compensatory damages, including, but not limited to, emotional pain and suffering, mental anguish and other intangible injuries, and ultimately resulted in Plaintiff's constructive discharge from employment at the end of December 2017.

WHEREFORE, Plaintiff, THADDEUS MENSAH, prays that this Court will:

(a)     Declare Defendant conduct to be in violation of the Rehabilitation Act;

(b)     Enjoin Defendant from further engaging in such retaliatory conduct;

(c)     Award Plaintiff compensatory damages;

(d)     Award Plaintiff his costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988, and;

(f)     Grant such other and further relief as may be deemed just and proper.

## COUNT III

### Race Discrimination

83.     Plaintiff re-alleges paragraphs 1 through 73 as if fully set forth herein.

84.     The conduct of Defendant more particularly alleged above constitutes a violation of Title VII, which makes it an unlawful employment practice for an employer to discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race.

85.     By engaging in the conduct described herein, Defendant subjected Plaintiff to disparate treatment based on his race (black).  The adverse treatment to which MENSAH was subjected included, but was not limited to: unwarranted scrutiny and criticism of his job performance; inequitable distribution of workload; downgrading his annual performance rating so that he would be terminated for poor performance if he did not find an alternative position and verbal harassment by his supervisor (Patricia Benedetti) and a co-worker (Domingo Antonio Jimenez).

86.     The adverse treatment and verbal harassment of MENSAH based on his race resulted in a hostile work environment that was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

87.     Defendant's unlawful conduct in violation of Title VII caused Plaintiff to suffer compensatory damages, including, but not limited to, emotional pain and suffering, mental anguish and other intangible injuries and ultimately resulted in Plaintiff's constructive discharge from employment at the end of December 2017.

WHEREFORE, Plaintiff, THADDEUS MENSAH, prays that this Court will:

(a)     Declare Defendant's conduct to be in violation of Title VII;

(b)     Enjoin Defendant from further engaging in such conduct;

(c)     Award Plaintiff compensatory damages;

(d)     Award Plaintiff his costs and reasonable attorney's fees pursuant to 42 U.S.C. §
1988, and;

(e)     Grant such other and further relief as may be deemed just and proper.

## COUNT IV

### National Origin Discrimination

88.     Plaintiff re-alleges paragraphs 1 through 73 as if fully set forth herein.

89.     The conduct of Defendant more particularly alleged above constitutes a violation of Title VII, which makes it an unlawful employment practice for an employer to discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment, because of such individual's national origin.

90.     By engaging in the conduct described herein, Defendant subjected Plaintiff to disparate treatment based on his national origin (Ghana Africa).  The adverse treatment to which MENSAH was subjected included, but was not limited to: unwarranted scrutiny and criticism of his job performance; inequitable distribution of workload; downgrading his annual performance rating  so that he would be terminated for poor performance if he did not find an alternative position and verbal harassment by his supervisor (Patricia Benedetti) and a co-worker (Domingo Antonio Jimenez).

91.     The adverse treatment and verbal harassment of MENSAH based on his national origin resulted in a hostile work environment that was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment.

92.     Defendant's unlawful conduct in violation of Title VII caused Plaintiff to suffer compensatory damages, including, but not limited to, emotional pain and suffering, mental anguish

and other intangible injuries, and ultimately resulted in Plaintiff's constructive discharge from employment at the end of December 2017.

WHEREFORE, Plaintiff, THADDEUS MENSAH, prays that this Court will:

(a)    Declare Defendant's conduct to be in violation of Title VII;

(b)    Enjoin Defendant from further engaging in such conduct;

(c)    Award Plaintiff compensatory damages;

(d)    Award Plaintiff his costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988, and;

(e)    Grant such other and further relief as may be deemed just and proper.

Respectfully submitted,

*Christopher C. Sharp*
Christopher C. Sharp, Esq.
Fla. Bar No. 996858
Email: charplaw@aol.com
Secondary email: chris@csharplawfirm.com
SHARP LAW FIRM, P.A.
1600 West State Road 84, Suite C
Fort Lauderdale, FL 33315
Telephone: (954) 909-4246
Facsimile: (954) 909-4265
Dated:  July 13, 2020          Counsel for Plaintiff THADDEUS MENSAH