**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-22876-CIV-ALTONAGA/Torres**

**THADDEUS A. MENSAH**,

      Plaintiff,

v.

**STEVEN MNUCHIN,** Secretary,
United States Department of Treasury,

      Defendant.

_____/

## <u>ORDER</u>

**THIS CAUSE** came before the Court on Defendant, Steven Mnuchin's Motion to Dismiss
[ECF No. 8], filed on September 25, 2020.  Plaintiff, Thaddeus A. Mensah, filed a Response [ECF
No. 15] to the Motion, to which Defendant filed a Reply [ECF No. 21].  The Court has carefully
considered the Complaint [ECF No. 1], the parties' written submissions, the record, and applicable
law.  For the following reasons, the Motion is granted in part and denied in part.

## I.       BACKGROUND

This is an employment discrimination and retaliation case.  (*See generally* Compl.).
Plaintiff was a tax compliance officer employed by the Internal Revenue Service (the "Agency"),
part of the United States Department of Treasury, from 2008 to December 2017.  (*See id.* ¶¶ 4,
13).  Plaintiff is a black citizen of the United States whose country of origin is Ghana, Africa.  (*See
id.* ¶¶ 5, 14).  Defendant is the current Secretary of the United States Department of Treasury.  (*See
id.* ¶ 7).

***Plaintiff's employment background***.  In 2008, the Agency hired Plaintiff in California as
a disabled individual under a workforce recruitment program for students with disabilities.  (*See*

*id.* ¶ 13).  Plaintiff suffers from physical impairments, including glaucoma, diabetes, anxiety disorder, major depression, and attention deficit disorder ("ADD").  (*See id.* ¶ 6).  Plaintiff was employed by Defendant for nearly 10 years.  (*See id.* ¶ 13).  He initially worked for Defendant in California but was transferred to Fort Myers, Florida in 2013.  (*See id.* ¶ 15).  At that office, Plaintiff's supervisor was Connelia Finn.  (*See id.*).  Plaintiff was able to meet his position's caseload and performance standards without any need for reasonable accommodations.  (*See id.*).

In November 2014, Plaintiff was granted a hardship transfer to the Tax Compliance Office in Miami, Florida, where he was assigned to Group 5 and supervised by Patricia Benedetti.  (*See id.* ¶ 16).  At the time of transfer, Plaintiff had completed his probationary period and training in Fort Myers and was rated "fully successful" on his annual performance appraisal.  (*Id.* (quotation marks omitted)).  In Miami, however, the consistently higher caseload and lack of managerial support exacerbated Plaintiff's disabilities, making it increasingly difficult for Plaintiff to meet Benedetti's performance expectations.  (*See id.* ¶ 17).  Plaintiff's average weekly caseload in Miami was significantly greater than in Fort Myers and approximately 30 percent higher than Defendant's guidelines for GS-9 and GS-11 tax compliance officers.  (*See id.*).

Between November 2015 and June 2016, the Agency temporarily assigned Benedetti to other duties, and Finn was appointed as acting manager of the Miami Tax Compliance Office. (*See id.* ¶ 18).  When Plaintiff's disabilities began to affect his job performance, Plaintiff attempted to speak to Benedetti about certain issues.  (*See id.* ¶ 19).  Benedetti neither showed empathy for Plaintiff nor referred him to Defendant's Reasonable Accommodations Coordinator or the Equal Employment Opportunity ("EEO") Office.  (*See id.*).  Instead, Benedetti "mocked Plaintiff for seeking assistance and accused him of trying to use his disabilities as an excuse for not doing his job."  (*Id.*).

When Plaintiff turned to Finn for assistance regarding his increased caseload, Finn suggested he consider seeking assistance through Defendant's Employee Assistance Program. (*See id.* ¶ 20).  In June 2016, Plaintiff received a fully successful rating of 3.0 from Finn in his annual evaluation, doing so despite the significantly higher caseload.  (*See id.* ¶ 21).  Finn also completed a "departure evaluation" for the period of June 1, 2016 to September 17, 2016, in which Finn rated Plaintiff "fully successful."  (*Id.* ¶ 22 (quotation marks omitted)).

In September 2016, Benedetti resumed her day-to-day duties as Plaintiff's manager.  (*See id.* ¶ 23).  Benedetti "increased Plaintiff's caseload and renewed her harsh and unwarranted criticism of his job performance whenever he tried to seek guidance or assistance." (*Id.*).  At that same time, Plaintiff reached out to his union representative who agreed with Plaintiff that Benedetti's assigned caseload exceeded the Agency's guidelines and was unreasonable.  (*See id.* ¶ 24).

On September 27, 2016, Plaintiff sent the following email to Benedetti and her supervisor, Debbie McMillan:

> I would like to discuss a very personal and Important matter with you.  I have a serious health issue and would like to schedule a conference call meeting and discuss it with you.  I believe it is important to let you know what is going on with me so that you may able [sic] to help me with my work from now on.  Please let me know what day is available this week for to [sic] discuss this Issue.
>
> Thank you so much for your patience with me being here.

(*Id.* ¶ 25).  Plaintiff, Benedetti, and McMillan participated in a conference call, during which Plaintiff discussed his disabilities and asked Benedetti and McMillan to consider "some type of adjustment or reduction" of his high caseload and/or new case assignments.  (*Id.* ¶ 26).  Shortly thereafter, Benedetti advised Plaintiff that he needed to submit a formal written request in accordance with the Agency's policies and procedures.  (*See id.* ¶ 27).

On October 27, 2016, Plaintiff submitted a Treasury Form 13661 Reasonable Accommodations Request for multiple impairments, including glaucoma, ADD, and diabetes. (*See id.* ¶ 28). Plaintiff requested a 20 to 30 percent reduction of his then-average caseload of more than 100 cases. (*See id.*). According to Plaintiff, his requested workload was "consistent with his job description and Agency guidelines that dictated an average caseload of 65 to 70 cases." (*Id.*). Benedetti and McMillan had already decided in early October 2016 to deny Plaintiff's request for reasonable accommodations. (*See id.* ¶ 29).

Benedetti and McMillan's unilateral decision to deny Plaintiff's request for accommodations was a clear violation of Defendant's EEO policies and procedures. (*See id.* ¶ 30). Specifically, the Agency neither conducted any meaningful interactive process with Plaintiff to discuss the accommodation requests, nor performed any formal review of essential functions to determine the appropriate caseload for Plaintiff's position. (*See id.* ¶¶ 30–31). Benedetti also violated the Agency's policies when she shared Plaintiff's confidential information regarding his disabilities and accommodation requests with Domingo Antonio Jimenez, a group clerk. (*See id.* ¶ 33).

After the denial of Plaintiff's initial request, Benedetti "reacted in an openly negative and hostile manner to Plaintiff's [other] formal requests for accommodations and his subsequent attempts to discuss the issues as part of the interactive process." (*Id.* ¶ 32 (alteration added)). Benedetti appeared annoyed by Plaintiff's accommodation requests, viewing them "as an excuse to avoid doing his job and an attempt to undermine her managerial right and authority to assign his workload[.]" (*Id.* (alteration added)). Benedetti began to retaliate against Plaintiff for continuing to seek accommodations for his disabilities. (*See id.*). Her retaliation continued for nearly a year until she left the Miami office for another position in July 2017. (*See id.*).

Plaintiff maintained a good working relationship with Jimenez during his first year in Miami.  (*See id.* ¶ 33).  Upon learning of Plaintiff's accommodation requests, Jimenez's attitude toward and treatment of Plaintiff changed.  (*See id.*).  Despite not holding any managerial or supervisory position, Jimenez openly berated Plaintiff in group meetings and singled him out for unfair treatment.  (*See id.* ¶¶ 33–34).  He refused to provide Plaintiff with the same administrative support extended to Plaintiff's coworkers.  (*See id.* ¶ 34).  Jimenez "mocked Plaintiff's national origin by making offensive jokes and negative references about the fact that Plaintiff was born in Ghana, Africa before he became a United States Citizen."  (*Id.*).  Benedetti and McMillan took no remedial action to stop Jimenez's "constant mocking and criticism" of Plaintiff.  (*Id.* ¶ 35).

During the last three months of 2016, Benedetti inhibited and frustrated Plaintiff's ability to complete his workload in a timely manner.  (*See id.* ¶ 36).  By way of example, Benedetti changed Plaintiff's work schedule from eight hours per day, five days a week, to a compressed schedule of four, ten-hour days per week.  (*See id.*).  This compressed schedule caused more fatigue and increased Plaintiff's difficulties with focus, concentration, and workload management.  (*See id.*).  Benedetti continued to single Plaintiff out for harsh criticism, doing so even though Plaintiff treated her and others with the utmost respect and spoke in a calm, polite, and professional manner.  (*See id.* ¶ 37).

Between October 2016 and July 2017, Group 5 implemented a manager rotation to make up for Benedetti's other, frequent management duties.  (*See id.* ¶ 38).  This manager rotation eroded Plaintiff's ability to communicate with Benedetti about his workload issues and accommodation requests.  (*See id.*).  On the rare occasions Benedetti was assigned to Group 5, she either denied or simply ignored Plaintiff's requests for periodic workload reviews or any additional training that would assist in managing his caseload.  (*See id.* ¶ 39).  Benedetti "spoke down to [Plaintiff] in an

extremely harsh and unprofessional manner when he tried to seek her assistance or guidance." (*Id.* (alteration added)).  Benedetti intensified her documentation of Plaintiff's mistakes and privately accused him "of using his disabilities as an excuse for the fact [] he was stupid and lazy." (*Id.* (alteration added)).

In December 2016, after nearly two months had passed without any interactive process or response to his formal request for accommodations, Plaintiff submitted a second Treasury Form 13661 Reasonable Accommodations Request for his anxiety disorder and ADD.  (*See id.* ¶ 40).  Plaintiff's form was completed by a licensed clinical social worker who had treated Plaintiff.  (*See id.*).  The social worker requested a "workload adjustment to achieve manageable stress levels." (*Id.* (quotation marks omitted)).  Several weeks passed with no response to Plaintiff's formal request.  (*See id.* ¶ 41).  As a result, in January 2017, Plaintiff submitted a second Treasury Form 13661 Reasonable Accommodations Request for glaucoma and a third Treasury Form 13661 Reasonable Accommodations Request for his anxiety disorder and ADD.  (*See id.*).

Sometime in early 2017, Plaintiff was formally notified his accommodation requests for glaucoma and diabetes had been granted.   (*See id.* ¶ 42).  Plaintiff received an ergonomic chair and keyboard along with noise-cancelling headphones and an assistive device to increase the size of the font on his computer screen.  (*See id.*).  He did not, however, receive a formal response regarding his "three separate requests for accommodations for his ADD, depression[,] and anxiety disorder[.]"  (*Id.* (alterations added)).  Instead of responding to Plaintiff's requests, Benedetti continued to criticize Plaintiff and document his job performance.  (*See id.* ¶ 43).

On June 22, 2020, Dr. Papiya Ray, an occupational medicine consultant, submitted a report to Defendant's reasonable accommodation coordinator, Brenda Kampe, concluding, based on her independent review of Plaintiff's initial request, that "a reduction in caseload would reduce one of

[his] stressors, thereby improving his symptoms and relieving some of his limitations." (*Id.* ¶ 46 (alteration added)). On June 26, 2017, Kampe forwarded Dr. Ray's report to Plaintiff, Benedetti, and McMillan with a request for management to consider a 30 percent caseload reduction. (*See id.* ¶ 47). Benedetti and McMillan did not consider the caseload reduction or participate in any interactive process or discussion with Plaintiff regarding Dr. Ray's findings. (*See id.*).

On June 27, 2017 — over eight months after Plaintiff's submission of his first Treasury Form 13661 in October 2016 — McMillan completed Part IV of the form and denied Plaintiff's request for a "reduction of workload." (*Id.* ¶ 48 (quotation marks omitted)). In the Reasons for Denial section of the form, McMillan checked the following boxes: "Accommodation Ineffective/Inappropriate[;]" "Accommodation Would Require Removal of Essential Function[;]"and "Accommodation Would Require Lowering of Performance or Production Standard." (*Id.* (alterations added; quotation marks omitted)). She did not select the box for "Accommodation Would Cause Undue Hardship." (*Id.* (quotation marks omitted)).

In Section 4 of Part IV, McMillan provided a narrative explanation for her decision:

> An employee with a disability must meet the same production standards, whether quantitative or qualitative, as a non-disabled employee in the same job. Lowering or changing a production standard because an employee cannot meet it due to a disability is not considered a reasonable accommodation.

> However, a reasonable accommodation may be required to assist an employee in meeting a specific production standard. In this case, the employee has been provided with ergonomic chair and IRAP Equipment, including large monitor, large keyboard, noise canceling headphones and Zoom technology in order to assist him in meeting the performance and production standards of the position. He also has been provided with a mentor/coach for technical and procedural support.

(*Id.* ¶ 49). McMillan's form denial gave Plaintiff "critical notice of [his] rights to seek reconsideration of the denial (within 15 days of receipt) and the right to challenge the decision through the Agency's EEO process (within 45 days of receipt)." (*Id.* ¶ 50 (alteration added)).

Plaintiff was unaware of these significant developments regarding his first Treasury Form

13661 request for accommodations.  (*See id.* ¶ 45).  Defendant's policies required that Plaintiff receive the formal denial of his accommodations request.  (*See id.* ¶ 51).  Plaintiff "never received a copy of Part IV of the Form 13661 that was purportedly completed by [] McMillan on June 27, 2017."  (*Id.* (alteration added)).  Defendant deprived Plaintiff of any notice of his right to seek reconsideration or avail himself of the EEO process.  (*See id.*).  Had Plaintiff received proper notice, he surely would have voiced concerns about the unreasonable delays in responding to his requests and Benedetti's unfair treatment after Plaintiff submitted his requests.  (*See id.*).

In June 2017, Plaintiff anticipated receiving an annual performance appraisal from Benedetti.  (*See id.* ¶ 44).  Given Benedetti's harsh criticism in the prior months and recurring details to other duties in the office, Plaintiff "was highly concerned [] the review process would not be conducted fairly by [] Benedetti and instead would be used against him."  (*Id.* (alterations added)).  Benedetti was too busy to meet Plaintiff in June and finally met with him on July 23, 2017 to conduct his performance review.  (*See id.* ¶ 52).  At that time, Benedetti was in the process of transferring to a new position in Broward County, Florida.  (*See id.*).  Benedetti "seemed distracted and irritated during the brief meeting," speaking to Plaintiff "in an extremely rude and unprofessional manner concerning his job performance during the preceding year[.]"  (*Id.* (alteration added)).

Plaintiff received a 1.8 score on his annual performance appraisal.  (*See id.* ¶ 53).  Because of the score, the Agency's policies dictated that Plaintiff "be placed on a formal Performance Improvement Plan [] and that if [h]is performance did not improve or if he failed to find another position within the Agency[,] he could be involuntarily separated from his employment."  (*Id.* (alterations added)).  Plaintiff filed a written appeal with human resources, citing the "lack of fairness in the evaluation process" and disability discrimination.  (*Id.* ¶ 54 (quotation marks

omitted)).  Plaintiff "never received any response from [h]uman [r]esources to either the appeal or his complaint of disability discrimination during the evaluation cycle, nor was he provided with any notice regarding his EEO rights."  (*Id.* ¶ 55 (alterations added)).

Benedetti formally left the Miami office at the end of July 2017.  (*See id.* ¶ 56).  She was replaced by rotating group managers "who had no authority to consider or make decisions on accommodation requests and no desire to assist [Plaintiff] with his caseload issues."  (*Id.* (alteration added)).  At the direction of her supervisor, Kampe began to assist Plaintiff with his efforts to find an alternative position within the Agency.  (*See id.* ¶ 57).  If those efforts proved unsuccessful, Plaintiff would be placed on a Performance Improvement Plan.  (*See id.*).  Plaintiff did not find a suitable position, nor was he offered another job in the Agency between August and December 2017.  (*See id.* ¶ 58).  Kampe "never advised" Plaintiff "local management had formally denied his requests for accommodations and never provided him with a copy of Part IV of the Form 13661 that was purportedly completed by [] McMillan on June 27, 2017."  (*Id.* ¶ 59 (alteration added)).

In September and October 2017, the Miami office's employees were instructed to work from home as a result of Hurricane Irma.  (*See id.* ¶ 60).  The employees' work-related communication moved to a WhatsApp group chat.  (*See id.*).  Group 5 was aware that Plaintiff was visiting Ghana from September 18, 2017 to October 23, 2017 due to a death in his family.  (*See id.*).  On October 20, 2017, Jimenez "posted an extremely offensive picture" to the WhatsApp group chat.  (*Id.* ¶ 61).  The picture "depicted an individual dressed in what appeared to [be] a ceremonial African tribal costume with feathers, spear and shield, under which [] Jimenez had typed the words 'TCO Returns Home.'"  (*Id.* (alterations added)).

Upon becoming aware of Jimenez's post, Plaintiff was "extremely distressed by the

incident" and Jimenez's "ongoing harassment." (*Id.* ¶ 62). Plaintiff reported Jimenez's discrimination to the acting group manager, Xavier Berros Rosero, and Kampe, both of whom advised Plaintiff to contact Defendant's EEO Office for counseling. (*See id.* ¶¶ 62–63). Plaintiff contacted the EEO Office on November 14, 2017. (*See id.* ¶ 64). At that time, Plaintiff "had still not been advised by the Agency of the formal denial of his accommodation[s] request and, in violation of Agency policies, had still never been provided with Part [IV] of the Form 13661 . . . that was purportedly completed by [] McMillan on June 27, 2017." (*Id.* (alterations added)). Plaintiff therefore set forth allegations in his EEO request of (1) lack of reasonable accommodations; and (2) disparate treatment and hostile work environment based on his disabilities, race, and national origin. (*See id.*).

In November 2017, Plaintiff was suffering from acute anxiety and depression as a result of his workplace issues, seeking treatment from a mental-health provider, Dr. Stanley Seidman. (*See id.* ¶ 65). Dr. Seidman prepared a 24-page report detailing Plaintiff's diagnosis and treatment. (*See id.*). Dr. Seidman supported Plaintiff's request for an adjustment of his caseload as a reasonable accommodation. (*See id.*). Plaintiff submitted the report to Agency management and made his final request for a reduction of caseload. (*See id.* ¶ 66). McMillan denied Plaintiff's request in December 2017. (*See id.*).

During the EEO counseling process, Plaintiff was never informed whether any disciplinary action or other remedial action was taken against Jimenez for the "offensive WhatsApp posting." (*Id.* ¶ 67). Another incident involving Plaintiff and Jimenez occurred in early December 2017. (*See id.* ¶ 68). Plaintiff requested printer ink cartridges from Jimenez when he was handing out cartridges to employees. (*See id.*). Jimenez "aggressively yelled" at Plaintiff to go get the cartridges from the supply room if Plaintiff needed ink for his printer. (*Id.*).

On December 22, 2017, Dr. Seidman penned a note to the "Concerned IRS" stating: "[Plaintiff] is under my care for a severe stress disorder.  As of December 22, 2017, due to the severity of his mental status, I am recommending that he cease performing case work with the [Agency] and that he apply for disability immediately."  (*Id.* ¶ 69 (alterations added; quotation marks omitted)).  Plaintiff applied for disability retirement with the Office of Personnel Management on February 2, 2018.  (*See id.* ¶ 70).  In an August 2018 decision, the Office of Personnel Management determined Plaintiff was "eligible for disability retirement because he was disabled for [his] position as a Tax Compliance Officer due to generalized anxiety disorder and major depressive disorder."  (*Id.* ¶ 71 (alteration added; quotation marks omitted)).

Defendant offered no legitimate reasons for the denial of Plaintiff's "requests for reasonable accommodations, the reprisal he endured from [] Benedetti following his requests for accommodations[,] or the discrimination to which he was subjected based on race and national origin."  (*Id.* ¶ 72 (alterations added)).  Plaintiff felt "compelled to resign" because of: (1) "Defendant's denial of reasonable accommodations from October 2016 to December 2017[;]" (2) "the discrimination and hostile work environment created by [] Benedetti and . . . Jimenez[;]"and (3) the "intolerable" working conditions.  (*Id.* ¶ 73 (alterations added)).

***Plaintiff's EEO complaint***.  On January 31, 2016, Plaintiff filed a timely Formal EEO Complaint of Discrimination ("EEO Complaint") with Defendant's EEO Office.  (*See id.* ¶ 8).  Plaintiff raised claims of race discrimination, national origin discrimination, disability discrimination, and reprisal.  (*See id.*).  Plaintiff has complied with all administrative prerequisites to pursue his claims in federal court.  (*See id.* ¶¶ 9–11).

***Plaintiff's Complaint***.  On July 13, 2020, Plaintiff filed his Complaint asserting four claims: disability discrimination in violation of the Rehabilitation Act of 1973 ("Rehabilitation

11

Act"), 29 U.S.C. section 794 *et seq.* (Count I) (*see id.* ¶¶ 74–77); retaliation for having requested reasonable accommodations under the Rehabilitation Act (Count II) (*see id.* ¶¶ 78–82); race discrimination in violation of Title VII, 42 U.S.C. section 2000e *et seq.* (Count III) (*see id.* ¶¶ 83– 87); and national origin discrimination in violation of Title VII (Count IV) (*see id.* ¶¶ 88–92).

**Defendant's Motion.**  Defendant moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), arguing: (1) Plaintiff has failed to exhaust administrative remedies with respect to his claims of constructive discharge, failure to accommodate, and a negative performance evaluation (*see* Mot. 3, 5–10);[1] and (2) Plaintiff has failed to include enough factual allegations to support his retaliation claim under the Rehabilitation Act, and race and national origin discrimination claims under Title VII (*see id.* 3–4, 10–18).

## II.   ANALYSIS

### A.  Exhaustion of Remedies

Defendant provides a copy of Plaintiff's EEO Complaint filed with the Department of Treasury (*see* Mot., Ex. A, EEO Complaint [ECF No. 8-1]),[2] and contends Plaintiff did not exhaust his administrative remedies with respect to his allegations of constructive discharge, failure to

---

[1] Defendant does not specify he is seeking dismissal based on failure to exhaust administrative remedies under Rule 12(b)(6).  (*See* Mot. 4.)  Because exhaustion of administrative remedies is not a jurisdictional prerequisite, courts review motions to dismiss for failure to exhaust administrative remedies under the Rule 12(b)(6) standard (*see infra* 19–20) rather than under Rule 12(b)(1).  *See, e.g.*, *Banks v. Ackerman Sec. Sys., Inc.*, No. 1:09-CV-0229, 2009 WL 974242, at *2 n.3 (N.D. Ga. Apr. 10, 2009) (citations omitted).

[2] The Court considers the EEO Complaint because it is central to the Complaint and no question regarding its authenticity has been raised.  (*See* Compl. ¶¶ 8–11); *see also Rogers v. Wilkie*, No. 3:18-cv-00846, 2019 WL 6698139, at *4 n.1 (M.D. Ala. Dec. 6, 2019) ("Plaintiff's EEO Complaint is referenced in Plaintiff's Complaint and is central to her claims. Thus, the Court may consider the EEO Complaint as part of the pleadings for purposes of Defendants' motion to dismiss." (citations omitted)); *Glover v. Dist. Bd. of Trs. of Palm Beach State Coll.*, No. 9:19-cv-80968, 2019 WL 6340087, at *1 (S.D. Fla. Nov. 27, 2019) ("A court may consider an [administrative] charge that is attached to a motion to dismiss without converting the motion to a summary judgment motion where, as is the case here, the complaint refers to the [administrative] action, [] exhaustion is central to the viability of the plaintiff's claim, and the authenticity of the [] charge is not in dispute." (alterations added; citations omitted)).

accommodate, and a negative performance evaluation.  (*See* Mot. 3, 5–10).  The Court addresses each set of allegations.

       *Standard.*  Prior to filing a Title VII and Rehabilitation Act action, a federal employee must first exhaust his administrative remedies.  *See Crawford v. Babbitt*, 186 F.3d 1322, 1326 (11th Cir. 1999) (Title VII) (citation omitted); *Gaillard v. Shinseki*, 349 F. App'x 391, 392 (11th Cir. 2009) ("A plaintiff asserting a private right of action under the Rehabilitation Act must satisfy the exhaustion of administrative remedies requirement in the manner prescribed by Title VII[.]" (alteration added; citations omitted)).  As part of the exhaustion requirement, the aggrieved employee must "initiate administrative review of any alleged discriminatory or retaliatory conduct with the appropriate agency within 45 days of the alleged discriminatory act."  *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008) (citations omitted).

       "Generally, when the claimant does not initiate contact within the 45-day charging period, the claim is barred for failure to exhaust administrative remedies."  *Id.* (citation omitted).  Each discrete act "of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice" and "starts a new clock for filing charges alleging that act."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–14 (2002) (quotation marks omitted).  "[T]he 45-day time limit is not jurisdictional; rather, it functions like a statute of limitations, and, like a statute of limitations, it is subject to waiver, estoppel, and equitable tolling." *Ramirez v. Sec'y, U.S. Dep't of Transp.*, 686 F.3d 1239, 1243 (11th Cir. 2012) (alteration added; other alteration adopted; quotation marks and citation omitted).  "[T]he purpose of exhaustion is to give the agency the information it needs to investigate and resolve the dispute between the employee and the employer."  *Brown v. Snow*, 440 F.3d 1259, 1263 (11th Cir. 2006) (alteration added; quotation marks and citations omitted).

Considering that purpose, "a plaintiff's judicial complaint is limited by the scope of the [administrative agency's] investigation that can reasonably be expected to grow out of the charge" contained in the administrative complaint. *Litman v. Sec'y, of the Navy*, 703 F. App'x 766, 771 (11th Cir. 2017) (alteration added; citation omitted). "[J]udicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEO[] complaint," but "allegations of new acts of discrimination are inappropriate." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279–80 (11th Cir. 2004) (alterations added; quotation marks and citation omitted). Nonetheless, courts are "extremely reluctant to allow procedural technicalities to bar claims" and do not "strictly interpret[]" the scope of an administrative complaint. *Litman*, 703 F. App'x at 771 (alteration added; citation omitted); *see also Ray v. Freeman*, 626 F.2d 439, 443 (5th Cir. 1980) ("As long as allegations in the judicial complaint and proof are 'reasonably related' to charges in the administrative filing and 'no material differences' between them exist, the court will entertain them." (citations omitted)).

**Constructive discharge.**  Defendant contends Plaintiff's constructive discharge claim[3] must be dismissed because he did not present it in his EEO Complaint.  (*See* Mot. 6–8; Reply 1–4).  According to Defendant, there is no allegation in Plaintiff's EEO Complaint that "the working conditions have become so intolerable that he was compelled to resign."  (Reply 3).  Defendant insists Plaintiff's "constructive discharge claim, which is embedded in all counts of the Complaint, should [] be dismissed with prejudice."  (*Id.* 4 (alteration added)).  The Court disagrees.

---

[3] Plaintiff does not raise a stand-alone constructive discharge claim but rather alleges constructive discharge as a type of adverse employment action.  (*See* Compl. ¶¶ 73, 77, 82, 87, 92); *see also Lackey v. La Petite Acad., Inc.*, No. 2:18-cv-00429, 2020 WL 1285828, at *6 (N.D. Ala. Mar. 17, 2020) ("While constructive discharge is sometimes described as a 'claim,' under Title VII . . . , it is actually a type of adverse employment action." (alteration added; collecting cases)).

In his EEO Complaint, Plaintiff detailed his working conditions, explaining he "believe[d] that [he] ha[d] been subjected to[:]" (1) "continuous and ongoing discrimination by the [Agency] based on [his] disabilities, including the repeated denials of [his] requests for reasonable accommodations to [his] Group Manager beginning in or about mid-2015[;]" and (2) "reprisal by management for [his] accommodation requests and a hostile work environment by [his] co-workers, which include[d] the racially-insensitive and meaning [sic] WhatsApp post by [] Jimenez in October 2017." (*Id.* 6 (alterations added); *see also id.* 2–6).[4]  Plaintiff stated Dr. Seidman "remove[d] [him] from work due to [his] severe stress disorder" and "deteriorat[ing]" "psychological condition[,]" both of which were caused by "the ongoing lack of accommodations to assist [him] with [his] caseload, and the racially-insensitive WhatsApp post by [] Jimenez[.]" (*Id.* 5 (alterations added)).  Plaintiff concluded he "remained out of work on Dr. Seidman's orders." (*Id.*).

Quite simply, the Court finds Plaintiff's allegations of constructive discharge are reasonably related and could reasonably be expected to grow out of the charges in the EEO Complaint.[5]  *See Gregory*, 355 F.3d at 1280 ("The proper inquiry . . . is whether [the plaintiff's] complaint was like or related to, or grew out of, the allegations contained in h[is] EEO[] charge." (alterations added)).  In alleging constructive discharge (*see* Compl. ¶¶ 73, 77, 82, 87, 92), Plaintiff

---

[4] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

[5] Defendant insists Plaintiff's constructive discharge "claim" must be dismissed because he neither used the precise words "constructive discharge" in his EEO Complaint (Mot. 6), nor alleged "that the working conditions ha[d] become so intolerable that he was compelled to resign" (Reply 3 (alteration added)). Defendant's exacting standard is disfavored by the Eleventh Circuit.  *See Gregory*, 355 F.3d at 1280; *see also Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970) ("[T]he specific words of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow." (alteration added)).

describes the same conduct set out in his filing with the Agency; discusses the same incidents and

employment conditions; relies on the same acts claimed to constitute retaliation, discrimination,

and hostile work environment; and identifies the same perpetrators.[6]   (*Compare id.*, *with* EEO

Compl.).   Stated differently, Plaintiff's descriptions of constructive discharge do not involve

distinct factual allegations from those investigated by the Agency.   Plaintiff may thus pursue his

allegations concerning constructive discharge.[7]   *See Medina v. Waste Connections of N.Y., Inc.*,

No. 19-cv-291, 2019 WL 3532048, at *6 (S.D.N.Y. Aug. 2, 2019) (finding the plaintiff's

constructive discharge "claim" was reasonably related to his administrative charge because it was

based on "the same course of discrimination" described in the charge (quotation marks and citation

omitted)); *Coppinger v. Wal-Mart Stores, Inc.*, No. 3:07-cv-458, 2009 WL 3163211, at *9 n.23

(N.D. Fla. Sept. 30, 2009) (concluding the investigation of constructive discharge could reasonably

be expected to grow out of a hostile work environment claim).

---

[6] (*Compare* EEO Compl. 5 (stating Plaintiff "remained out of work" as a result of his "severe stress disorder" and "deteriorat[ing]" "psychological condition" caused by "the ongoing lack of accommodations to assist [him] with [his] caseload, and the racially-insensitive WhatsApp post by [] Jimenez" (alterations added)); *and id.* 6 (writing Plaintiff believed he had been subjected to discrimination based on "the denials of . . . reasonable accommodations" and "hostile work environment" created by "co-workers," citing "the above factual allegations" (alteration added)), *with* Compl. ¶ 73 (alleging Plaintiff felt "compelled to resign" "[a]s a result of Defendant's denial of reasonable accommodations . . . and the discrimination and hostile work environment created by [] Benedetti and . . . Jimenez" (alterations added))).

[7] Defendant urges the Court to apply the Eleventh Circuit's ruling in *Abram v. Fulton County Government*, 598 F. App'x 672 (11th Cir. 2015), to its exhaustion-of-remedies analysis.   (*See* Reply 3–4).   *Abram*, however, is off point.   In *Abram*, the court held the plaintiff failed to exhaust administrative remedies for her allegations of constructive discharge because she "*only*" alleged that she "had to resign due to health reasons; not that she had been forced to resign."   598 F. App'x at 678 (emphasis added; quotation marks omitted).   Although alluring at first glance, a review of the district court record reveals the plaintiff's administrative charge, unlike Plaintiff's EEO Complaint here, contained scant factual detail and conclusory allegations.   *See Abram v. Fulton Cnty. Gov't*, No. 09-cv-03587, 2009 Charge of Discrimination [ECF No. 109-7] 2 (N.D. Ga. Aug. 7, 2013) ("[M]y employer became aware of my severe medical condition. . . .   My request to work from home was never acknowledged.   I had to resign due to health reasons.   I believe that I have been discriminated against because of my disability in violation of Title I of the Americans with Disabilities Act of 1990[.]" (alterations added)).   The administrative charge in *Abram* is not like Plaintiff's EEO Complaint here, and thus, Defendant's reliance on *Abram* is misplaced.   *Compare id.*, *with* (EEO Compl.).

In sum, "[t]he purpose of th[e] exhaustion requirement is that the [administrative agency] should have the first opportunity to investigate the alleged discriminatory [or retaliatory] practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Gregory*, 355 F.3d at 1279 (alterations added; quotation marks and citations omitted). That purpose was satisfied here. The Court will not bar Plaintiff's allegations of adverse employment action based on constructive discharge on this basis.

***Failure to accommodate***. Defendant contends Plaintiff's "disability discrimination claim based on a failure to accommodate (Count I) should be dismissed for failure to exhaust administrative remedies." (Mot. 10). Defendant maintains Plaintiff's failure-to-accommodate "claim" is time-barred because he did not raise it until more than 45 days after the denial of his request for accommodation. (*See id.* 8–10). According to Plaintiff, he was unaware of his EEO appeal rights and administrative exhaustion requirements because "he never received a copy of the Agency's formal denial of his request for workload accommodations in June 2017[.]" (Resp. 13 (alteration added)). Plaintiff insists the Agency accepted his failure-to-accommodate "claim" as timely. (*See id.* 12–13).

As noted, "[u]nder . . . the Rehabilitation Act, federal employees are required to initiate administrative review of any alleged discriminatory or retaliatory conduct with the appropriate agency within 45 days of the alleged discriminatory act." *Shiver*, 549 F.3d at 1344 (alterations added). The 45-day limit is subject to extension if a plaintiff can show: (1) "that he or she was not notified of the time limits and was not otherwise aware of them[;]" (2) "that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred[;]" (3) "that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits[;]" or (4) "for other reasons

considered sufficient by the agency or the Commission." 29 C.F.R. § 1614.105(a)(2) (alterations added).   "This regulation codifies the doctrine of equitable tolling whereby the party seeking tolling must prove (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Saenz v. Wilkie*, No. 2:18-cv-01363, 2019 WL 3997077, at *6 (N.D. Ala. Aug. 23, 2019) (quotation marks and citations omitted).

The Court declines the parties' invitation to determine whether equitable tolling is (or is not) warranted at the motion-to-dismiss stage.[8]   Although "[e]quitable tolling is an extraordinary remedy which should be extended only sparingly[,]" *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1242 (11th Cir. 2004) (alterations added; quotation marks and citation omitted), Plaintiff alleges enough facts supporting his contention he neither knew nor had reason to know about the applicable time limit (*see* Compl. ¶¶ 45, 51, 55, 59, 64).

By way of example, Plaintiff alleges he "never received a copy of Part IV of the Form 13661 that was purportedly completed by [] McMillan on June 27, 2017" (*id.* ¶ 51 (alteration added)); and that he was unaware of his "right to seek reconsideration or avail himself of the EEO process" (*id.*).   Plaintiff further alleges he continued to diligently pursue his rights because, as of November 2017, he "still [had not] been provided with Part D of the Form 13661 Request for Accommodations that was purportedly completed by [] McMillan on June 27, 2017." (*Id.* ¶ 64

---

[8] Plaintiff dedicates a good part of his argument to highlighting the fact the Agency received and investigated his charge of failure to accommodate. (*See* Resp. 12–13).   Plaintiff contends Defendant waived his timeliness argument. (*See id.*).   As Defendant rightly notes, "the investigation of an untimely administrative claim does not preclude [Defendant] from asserting untimeliness as a defense in federal court[.]"   (Reply 5 (alterations added)); *see also Tonkyro v. Sec'y, Dep't of Veterans Affs.*, No. 8:16-cv-2419, 2018 WL 5830584, at *8 (M.D. Fla. Nov. 7, 2018) (noting the administrative agency's "acceptance of a claim for investigation is not necessarily the equivalent of an [] adjudication on the timeliness of the claim." (alteration added; citing *Fortson v. Carlson*, 618 F. App'x 601, 605 (11th Cir. 2015))).

(alterations added)). While further proceedings may establish that equitable estoppel should not apply (*see* Mot. 9 (stating Plaintiff's "contentions are belied by the record")), at the motion-to-dismiss stage, Plaintiff alleges enough facts to support the application of equitable estoppel (*see* Compl. ¶¶ 45, 51, 55, 59, 64). *See also Saenz*, 2019 WL 3997077, at *6 (declining to determine whether equitable tolling is warranted at the motion-to-dismiss stage and instead giving "the parties an opportunity to conduct discovery and to sufficiently develop the record.").

In short, Count I may proceed. [9]

***Negative performance evaluation***. Defendant contends Plaintiff's "annual performance rating" allegations raised in Counts II, III, and IV are untimely because the evaluation occurred prior to 45 days before the filing of Plaintiff's EEO Complaint. (Mot. 10). To this, Plaintiff states "he was unaware of his EEO rights at the time he received the rating, which satisfies the timeliness requirements [of] 29 C.F.R. [section] 1614.105(a)(2)." (Resp. 14 (alterations added); *see also* Compl. ¶¶ 50–51, 55). The Court has already concluded it will not decide whether equitable tolling is (or is not) appropriate in this situation on a motion to dismiss. For the same reasons, the Court will not exclude Plaintiff's performance evaluation allegations as untimely.

***Decision***. The Court denies Defendant's Motion based on exhaustion of administrative remedies.

## B. Failure to State a Claim

Defendant also argues Plaintiff fails to state claims for relief in Counts II, III, and IV. (*See* Mot. 10–18; Reply 8–10). The Court addresses each count.

***Standard***. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

---

[9] Defendant provides no additional arguments in support of his request for dismissal of Count I. (*See generally* Mot.; Reply).

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (alteration added; quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (alteration added; citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added; citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

When considering a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)).

***Count II***.  Count II asserts a retaliation claim under the Rehabilitation Act.  (*See* Compl. ¶¶ 78–82).  Defendant challenges the legal sufficiency of this claim.  (*See* Mot. 10–13; Reply 8–9).

"The Rehabilitation Act prohibits retaliation in employment against disabled persons by the federal government[.]" *Allen v. U.S. Postmaster Gen.*, 158 F. App'x 240, 243 (11th Cir. 2005)

(alteration added; citation omitted).  To succeed on a retaliation claim under the Rehabilitation Act, a plaintiff must show: "(1) [he] engaged in statutorily protected expression; (2) [he] suffered a materially adverse employment action; and (3) there was some causal relationship between the two events." *Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec.*, 410 F. App'x 243, 246 (11th Cir. 2011) (alterations added; citing *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (2008)); *see also Solloway v. Clayton*, 738 F. App'x 985, 988 (11th Cir. 2018) (stating courts in the Eleventh Circuit "assess retaliation claims under the Rehabilitation Act using the same framework as Title VII retaliation claims." (citation omitted)).

Defendant first contends Plaintiff does not allege a materially adverse employment action. (*See* Mot. 11–12).  A plaintiff satisfies the materially adverse action element if he "show[s] that a reasonable employee would have found the challenged action materially adverse[.]" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (alterations added; citations omitted). "The acts must be material and significant and not trivial." *Burgos-Stefanelli*, 410 F. App'x at 246 (citations omitted).  "A materially adverse action is one that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Shannon v. Postmaster Gen. of U.S. Postal Serv.*, 335 F. App'x 21, 26 (11th Cir. 2009) (quotation marks and citation omitted). "[T]he significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters." *White*, 548 U.S. at 69 (alteration added).

Plaintiff sufficiently pleads he suffered an adverse employment action.  (*See* Resp. 14–15 (citing Compl. ¶¶ 33–37, 52–54, 57–58); *see also* Compl. ¶¶ 80, 82).  Plaintiff alleges he received a negative performance evaluation, unwarranted scrutiny and criticism of his job performance, an inequitable distribution of workload, and verbal harassment following his initial request for reasonable accommodations.  (*See* Compl. ¶¶ 80–81; *see also id.* ¶¶ 32, 34, 39, 57–58).  He further

alleges "Defendant's unlawful conduct in violation of the Rehabilitation Act . . . resulted in Plaintiff's constructive discharge from employment at the end of December 2017." (*Id.* ¶ 82 (alteration added); *see also id.* ¶ 73). A reasonable employee could certainly find Defendant's alleged conduct to be materially adverse.[10] *See Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017) (evaluating constructive discharge as an adverse employment action under the Rehabilitation Act); *McNeal v. Duval Cnty. Sch. Bd.*, No. 3:11-cv-00498, 2011 WL 6010293, at *3 (M.D. Fla. Dec. 1, 2011) (declining to dismiss retaliatory-based claim under the Rehabilitation Act where the plaintiff alleged she was "demoted resulting in a substantial loss of pay, received poor performance reviews, and was denied merit pay and travel and training opportunities.").

Defendant next contends there is no causal connection between Plaintiff's alleged protected activity and materially adverse actions. (*See* Mot. 12–13). A plaintiff satisfies the causal-relationship element if he "provides sufficient evidence that [his] employer had knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action." *Burgos-Stefanelli*, 410 F. App'x at 246 (alteration added; other alteration adopted; quotation marks and citation omitted). "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Simpson v. State of Ala. Dep't of Human Res.*, 501 F. App'x 951, 954 (11th Cir. 2012) (quotation marks and citation omitted).

"A close temporal proximity between the protected expression and an adverse action is

---

[10] Defendant appears to concede Plaintiff's alleged involuntary resignation would constitute a materially adverse action if he can successfully show he was constructively discharged. In Defendant's words: "[O]ther than the [] constructive discharge claim, none of the other actions that Plaintiff alleges had any tangible, negative effect on his employment or otherwise would have dissuaded a reasonable worker from making or supporting a charge of discrimination." (Reply 9 (alterations added)). The Court need not discuss whether the remaining acts qualify as adverse employment actions at this juncture, especially given Defendant's concession Plaintiff's alleged constructive discharge satisfies the materially adverse action element of his claim.

sufficient circumstantial evidence of a causal connection for purposes of a prima facie case." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (quotation marks and citation omitted). "However, a lapse in time beyond three or four months, in the absence of other evidence tending to show causation, is insufficient to show close temporal proximity." *Simpson*, 501 F. App'x at 954 (citation omitted). "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (alteration added; citations omitted); *see also McNeal*, 2011 WL 6010293, at *3 (explaining "a causal connection may appear after a longer period between a protected act and an adverse action where the events were temporally linked by a chain of retaliatory events." (citation omitted)).

Defendant asserts Plaintiff fails to adequately plead "a causal connection between his purported protected activity of seeking accommodations in September 2016 and the alleged adverse actions taken against him." (Mot. 12). Defendant insists the alleged retaliatory acts either "began before Plaintiff engaged in protected activity" or "occurred long after Plaintiff's alleged protected activity." (*Id.* 13 (emphasis omitted)). The Court disagrees.

Plaintiff points to a series of retaliatory acts and circumstances to establish a causal link between the protected activity (the September 2016 request for accommodations) and the alleged adverse employment actions (notably, the December 2017 involuntary resignation). (*See* Resp. 14–16). Plaintiff alleges: (1) he requested reasonable accommodations from both Benedetti and McMillan on September 27, 2016 (*see* Compl. ¶ 25); Benedetti reacted in an "openly negative and hostile manner[,]" viewing that request (and other requests) "as an excuse to avoid doing his job and an attempt to undermine her managerial right and authority to assign his workload" (*id.* ¶ 32

(alteration added)); Benedetti increased her scrutiny and criticism of Plaintiff job performance during the last three months of 2016 (*see id.* ¶ 36); Benedetti frustrated Plaintiff's ability to complete his workload in a timely manner by requiring him to work a "compressed schedule" (*id.* (quotation marks omitted)); Benedetti privately accused Plaintiff "of using his disabilities as an excuse for the fact that he was stupid and lazy" (*id.* ¶ 39); Benedetti continued to criticize and document Plaintiff's job performance in January and February 2017 (*see id.* ¶¶ 42–43); Plaintiff was subjected to intensifying harsh criticism by Benedetti in the "prior months" before his June 2017 scheduled performance evaluation (*id.* ¶ 44); Benedetti issued Plaintiff a negative performance evaluation in July 2017, even though she spent most of 2017 assigned to other duties and not directly supervising Plaintiff (*see id.* ¶¶ 52, 57); in December 2017, Plaintiff felt compelled to resign given Defendant's denial of reasonable accommodations (*see id.* ¶¶ 73, 82); and Plaintiff received multiple fully successful evaluation ratings prior to requesting accommodations from Benedetti and McMillan in September 2016 (*see id.* ¶¶ 21–22).

These allegations make the inference of causation plausible on review of a motion to dismiss.[11] *See Dipietro v. City of Hialeah*, 424 F. Supp. 3d 1286, 1292–93 (S.D. Fla. 2020) (declining to dismiss retaliation claim despite a nearly four-year gap between the plaintiff's alleged protected activity and his termination where the plaintiff alleged a series of retaliatory acts taken by the defendant and other circumstances to bridge the temporal gap); *Matamoros v. Broward Sheriff's Off.*, No. 0:18-cv-62813, 2019 WL 4731931, at *4 (S.D. Fla. June 8, 2019) (denying motion to dismiss despite substantial delay where the plaintiff alleged facts that could be considered other evidence of retaliation); *McNeal*, 2011 WL 6010293, at *3 (declining to dismiss

---

[11] Defendant maintains Plaintiff's alleged chain of events is "far too conclusory to support a claim of retaliation." (Reply 8 (citing *Twombly*, 550 U.S. 544; *Iqbal*, 556 U.S. 662)). The Court is unpersuaded by Defendant's general citation to *Twombly* and *Iqbal*.

retaliation claim under the Rehabilitation Act despite six-month gap because "[c]lose temporal proximity between the adverse employment action and the protected activity is one common method of establishing a causal connection, . . . not the sole method." (alterations added; citation omitted)); *see also Saridakis v. S. Broward Hosp. Dist.*, 681 F. Supp. 2d 1338, 1356 (S.D. Fla. 2009) (denying summary relief on the plaintiff's retaliation claim where the temporal gap was linked by a chain of retaliatory events).

In short, Plaintiff's retaliation claim survives Defendant's Motion.

***Counts III and IV.***   Counts III and IV assert Title VII race and national origin discrimination claims.[12]   (*See* Compl. ¶¶ 83–92).   Defendant challenges the legal sufficiency of these claims.   (*See* Mot. 14–18).

Title VII "prohibits employers from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1152 (11th Cir. 2020) (quoting 42 U.S.C. § 2000e-2(a)(1)).   "A claim under this statutory section is referred to as a 'disparate treatment' claim." *Ortiz v. Sch. Bd. of Broward Cnty., Fla.*, 780 F. App'x 780, 783 (11th Cir. 2019) (citation omitted).   "Disparate treatment can take the form either of a tangible employment action, such as a firing or demotion, or of a hostile work environment that changes the terms and conditions of employment, even though the employee is not discharged, demoted,

---

[12] "Because Plaintiff's race discrimination and national origin discrimination claims arise out of the same facts, and because courts have observed that the line between race and national origin is an extremely difficult one to trace, the Court will analyze these claims together." *Carter v. Fla. Auto. Servs. LLC*, No. 8:13-cv-143, 2014 WL 3385048, at *4 n. 3 (M.D. Fla. July 10, 2014) (quotation marks and citation omitted); *Bailey v. DAS N. Am., Inc.*, -- F. Supp. 3d --, 2020 WL 4039193, at *6 (M.D. Ala. July 17, 2020) (analyzing the plaintiff's race and national origin discrimination claims together because "[t]he line between discrimination based on ancestry or ethnic characteristics, and discrimination based on place or nation of origin, is not a bright one." (alteration added; quotation marks and citation omitted)).

or reassigned." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (quotation marks and citation omitted).

Plaintiff proceeds under a hostile work environment theory.[13]  To establish a hostile work environment claim, a plaintiff must establish: "(1) he belongs to a protected group; (2) he suffered unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee, such as national origin [or race]; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for that environment under a theory of either direct liability or vicarious liability." *Fernandez*, 961 F.3d at 1153 (alteration added; citation omitted).  "[A]n employee must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018) (alteration added; quotation marks and citation omitted).

_____

[13] To be sure, in his Response, Plaintiff insists the Complaint's allegations create a "mosaic of discrimination" upon which a jury could find he was subjected to a "hostile and abusive" "work environment." (Resp. 19 (quotation marks omitted); *see also id.* (requesting that the Court defer ruling on his hostile work environment claim "until further discovery is conducted and Defendant seeks summary judgment")).  Moreover, Plaintiff's failure to respond to Defendant's tangible employment action contentions evinces his acknowledgement he is not pursuing that theory.  (*Compare* Mot. 14 –17, *with* Resp. 16–19.)

Even if Plaintiff did not clarify his claim — and even if he had responded to Defendant's arguments — Plaintiff fails to plausibly allege a tangible employment action that would support his disparate treatment claim based on his race and national origin.  Plaintiff alleges no employment-related consequences — save for the vague allegation "working conditions were so intolerable" (Compl. ¶ 73) — that he had to endure as a result of Jimenez's conduct directed at Plaintiff's race and national origin (*see id.* ¶ 34 (alleging Jimenez "did not hold any managerial or supervisory position")); *see also Hyde v. K.B. Home, Inc.*, 355 F. App'x 266, 271 (11th Cir. 2009) ("A tangible employment action is a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (alteration adopted; quotation marks and citations omitted)).

The "severe or pervasive" requirement is objective and subjective, as the harassing "behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (alterations adopted; quotations marks and citation omitted).  In considering the harassment's objective severity, factors include: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Id.* (citations omitted).  Stated differently, "Title VII prohibits only the type of harassment that alters the conditions of the victim's employment."  *Lara v. Raytheon Tech. Serv. Co., LLC*, 476 F. App'x 218, 221 (11th Cir. 2012) (alteration adopted; quotation marks and citation omitted).

Defendant contends Plaintiff fails to allege harassment that is sufficiently severe or pervasive to alter the terms and conditions of his employment.  (*See* Mot. 17–18; Reply 10).  Yet, Plaintiff insists Jimenez "openly subjected" him to "mocking comments about his intelligence and national origin" and "posted an offensive racial image of Plaintiff on the employee WhatsApp chat group[.]" (Resp. 16 (alteration added)).  According to Plaintiff, Defendant "ignores the totality of the evidence and the cumulative impact of the discrimination and harassment on Plaintiff's physical and mental health[.]"  (*Id.* 18 (alteration added)).  The Court agrees with Defendant.

Plaintiff alleges: (1) Jimenez "mocked Plaintiff's national origin by making offensive jokes and negative references about the fact that Plaintiff was born in Ghana, Africa before" he became a U.S. citizen (Compl. ¶ 34); (2) Jimenez "constant[ly] mock[ed] and critici[zed]" Plaintiff (*id.* ¶ 35 (alterations added)); (3) Jimenez "posted an extremely offensive picture on the employee chat group, which depicted an individual dressed in what appeared to [be] a ceremonial African

27

tribal costume with feathers, spear and shield, under which [] Jimenez had typed the words 'TCO Returns Home'" (*id.* ¶ 61 (alterations added)); (4) Plaintiff "was extremely distressed by the [post] and [Jimenez's] ongoing harassment" (*id.* ¶ 62 (alterations added)); and (5) Plaintiff suffered adverse employment actions and felt compelled to resign as a result of the discrimination and hostile work environment (*see id.* ¶¶ 73, 85–86, 90–91).

Plaintiff's allegations are either conclusory or fall far short of alleging a hostile work environment. By way of example, Plaintiff alleges Jimenez constantly mocked him by making offensive jokes and negative references (*see id.* ¶¶ 34–35), but there are no factual allegations establishing what was said or when and how often this conduct occurred. Plaintiff also complains the verbal harassment and adverse actions "alter[ed] the terms and conditions of [his] employment" (*id.* ¶¶ 86, 91 (alterations added)); but many of Plaintiff's allegations of harassment and adverse treatment — like the inequitable distribution of workload, negative performance rating, and questioning of his competence and job performance (*see id.* ¶¶ 34–35, 85, 90) — cannot plausibly be said to relate to non-supervisor Jimenez's conduct and Plaintiff's race or national origin.[14] All in all, Plaintiff's vague allegations a non-supervisor made offensive and negative comments and posted an extremely offensive picture do not raise the inference that he was subjected to a "workplace [] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive

---

[14] Plaintiff maintains "he was subjected to a series of discriminatory actions by . . . Benedetti . . . , including verbal harassment, unwarranted personal criticism[,] and concerted actions to undermine his ability to meet performance standards." (Resp. 16 (alterations added)). Plaintiff does not include any facts in his Complaint, nor does he provide any detail of Benedetti's conduct, supporting his assertion Benedetti engaged in discrimination against him based upon his race and national origin. The only allegations Plaintiff cites in his Response are paragraphs 60 through 62, and 73 (*see id.* 16–19); yet, those allegations either discuss Jimenez's conduct (*see* Compl. ¶¶ 60–62) or contain undeveloped allegations Benedetti engaged in discrimination and created a hostile work environment (*see id.* ¶ 73).

working environment."[15] *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008) (alterations added; quotation marks and citation omitted).

The Eleventh Circuit has found even more offensive conduct than Plaintiff alleges here insufficient to support a claim of hostile work environment. *See, e.g.*, *Fortson*, 618 F. App'x at 604, 607–08 (concluding there was no racially hostile environment where the plaintiff cited nine incidents of coworkers calling him racial epithets during two-and-a-half years of employment, with the harassing statements apparently stemming from coworkers' dissatisfaction with the plaintiff's job performance); *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1254 (11th Cir. 2014) (finding that conduct was not sufficiently severe or pervasive where the African-American plaintiff "saw his coworkers wear the Confederate flag on a regular basis," "saw racist graffiti in the men's restroom that he used on a daily basis[,]" "heard people say the slur 'n[*****]' . . . a 'few times' over two years," "heard about [a] noose in the breakroom, []though he did not see it himself." (alterations added)); *Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 57–58 (11th Cir. 2005) (concluding the display of the rebel flag on tool boxes and hard hats, the letters "KKK" appearing on bathroom wall and block-saw console, the use of the "n" word three times in one year, a noose in another employee's locker, and other isolated racial slurs were not severe or pervasive as to alter conditions of employment (quotation marks omitted)).

Perhaps aware of the weakness of his position, Plaintiff suggests the Court defer ruling

---

[15] The Response requests the Court impute Plaintiff's separate allegations of disability discrimination and retaliation to his Title VII hostile work environment claim.  (*See* Resp. 18 (chiding Defendant for ignoring the "totality of the evidence and the cumulative impact of the discrimination and harassment on Plaintiff's physical and mental health, which were described in detail in the medical reports that [he] submitted during the administrative proceedings and in support of his disability retirement application." (alteration added))). As Defendant correctly notes, "Title VII does not prohibit discrimination based in disability." (Reply 9); *see also Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1823 (2020) (Kavanaugh, J., dissenting) ("Title VII d[oes] not prohibit other forms of employment discrimination, such as . . . disability discrimination[.]" (alterations added)); *Ruedas-Rojas v. McAleenan*, No. 19-cv-22522, 2020 WL 6143652, at *7 (S.D. Fla. June 1, 2020) (recognizing that disability discrimination claims are not cognizable under Title VII).

CASE NO. 20-22876-CIV-ALTONAGA/Torres

"until further discovery is conducted and Defendant seeks summary judgment." (Resp. 19). Plaintiff's insufficient factual allegations accompanied by the expectation that discovery will produce evidence supporting his hostile work environment allegations cannot defeat Defendant's Motion. Certainly "[d]iscovery should follow the filing of a well-pleaded complaint[,]" but "[i]t is not a device to enable a plaintiff to make a case when his complaint has failed to state a claim." *Grimm v. City of Boca Raton*, No. 15- 80608-Civ, 2015 WL 4483974, at *5 (S.D. Fla. July 22, 2015) (alterations added; quotation marks and citation omitted); *see also Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997) ("Facial challenges to the legal sufficiency of a claim or defense, such as a motion to dismiss based on failure to state a claim for relief, should . . . be resolved before discovery begins." (alteration added; footnote call number omitted)).

In sum, Plaintiff's race and national origin discrimination claims are dismissed.

*Decision*. The Court grants Defendant's Motion for failure to state claims for relief as to Counts III and IV but denies it as to Count II.

### III.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendant, Steven Mnuchin's Motion to Dismiss **[ECF No. 8]** is **GRANTED in part** and **DENIED in part**. The Motion is **GRANTED** as to Counts III and IV. The Motion is **DENIED** as to Counts I and II. Defendant has until and including **November 23, 2020** to file an answer to Plaintiff's Complaint **[ECF No. 1]**.

**DONE AND ORDERED** in Miami, Florida, this 13th day of November, 2020.

_____

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record